UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

DAVID R. OLOFSON,

        Petitioner,

v.                                Case No. 10-C-0896

UNITED STATES OF AMERICA,

        Defendant.

---

ORDER DENYING AMENDED § 2255 MOTION (DOC. 4), DENYING AS MOOT MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS (D0C. 5), DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND DISMISSING CASE

David R. Olofson filed a § 2255 motion challenging his May 15, 2008, judgment of conviction on one count of knowingly transferring a machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). Following the jury's verdict after a two-day trial, this court sentenced Olofson to thirty-months imprisonment. Olofson filed a direct appeal arguing that this court erred in rejecting his proffered jury instruction, excluding his expert from the courtroom during the government's testimony of the expert and denying his motion to compel the government to produce certain evidence that he had requested. In addition, Olofson argued that the evidence presented at trial was insufficient to sustain his conviction, and that 18 U.S.C. §§ 922(o) and 924(a)(2) are unconstitutionally vague. The Seventh Circuit Court of Appeals affirmed the conviction and the United States Supreme Court denied Olofson's petition for a writ of certiorari. *United States v. Olofson*, 563 F.3d 652 (7th Cir. 2009), *cert. denied*, 558 U.S. 948 (2009).

Section 2255 provides a basis for attacking a federal sentence on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was

in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Consequently, § 2255 relief "is appropriate only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (internal quotation marks omitted).

Although Olofson filed a direct appeal, he now asserts that counsel was ineffective in preparing for trial and presenting his defense. Ineffective assistance of counsel claims may be raised for the first time under § 2255. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). To establish an ineffective assistance claim, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

The objective standard of reasonableness is evaluated under "prevailing professional norms," *Strickland*, 466 U.S. at 687–88, and "not whether it deviated from the best practices or most common custom." *Winston v. Boatwright*, 649 F.3d 618, 625 (7th Cir. 2011)(quoting *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011)). Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption of effectiveness in order to combat the distorting effects of hindsight and considering the reasonableness of counsel's conduct in the context of the case as a whole. *Atkins v. Zenk*, 667 F.3d 939, 944–45 (7th Cir. 2012). To show prejudice there must be a reasonable probability that but

for counsel's mistakes, the result of the proceedings below would have been different, such that the proceedings were fundamentally unfair or unreliable. *Strickland*, 466 U.S. at 694.

Olofson first argues that counsel was ineffective in failing to investigate. In support, identifies various documents and witnesses that could have been used in his defense. According to Olofson, "numerous material and character witnesses" would have "provided abundant points of reference for the jury in regards to the functionality and physical characteristics of the weapon in question, honesty and actions of the government's witness (both to apparent purgery [sic] committed by the agents involved in this case and criminal practices of the ATF), and what the defendant commonly said when loaning the weapon out." (Doc. 4, Attachment A.) In addition, Olofson claims his attorneys "went so far as to admit they never looked at, or even attempted to investigate any independent testing of the 'evidence' the government had sized [sic] from the defendants house when confronted by the court during the sentencing hearing." (*Id.*) Finally, Olofson maintains that a "simple internet search" would have provided impeachment information, undermined the ATF results, and that the government had documents that were not turned over.

The court has thoroughly reviewed the exhibits attached to Olofson's motion and finds nothing to establish deficient performance and prejudice as required by *Strickland*. The unauthenticated exhibits include a screen shot of Robert Kiernick's "Where Are You Now" internet page, a Memorandum from the Chief Counsel regarding a Freedom of Information Act Appeal, documents entitled "The Glover Tape: Caught in the Act of Innocence" plus "Why the ATF's Firearm Testing Procedures are Scientifically Invalid," a memorandum from a Specialist in Domestic Security regarding ATF Firearms Testing Procedures, a September 30, 2004, letter to Brian Blakely from the Chief of the ATF's

-3-

Firearms Technology Branch, and various letters by persons identified as potential witnesses. Much of it is critical of the ATF or relates to other investigations not involving the testing procedures utilized in this case. However, most of the material constitutes inadmissible hearsay or is otherwise irrelevant to the case presented by the government. Moreover, Olofson overstates the significance of this offering. For example, Olofson claims his attorneys admitted to not looking at certain documents prior to trial. However, he cites a single page from the sentencing transcript, Attachment G at 57, at which point the parties were discussing the Government's Exhibit A attached to the sentencing memorandum. (Case No. 06-CR-320, Doc. 108 at 56.) A scanned version of that document had been located on Olofson's computer when it was seized in the summer of 2006, but Olofson had no recollection of that document and defense counsel admitted that it was the first time he had seen the Army documents. (*Id.* at 57.) Defense counsel did not dispute that the document had been made available to the defense for discovery at the ATF offices. (*Id.*) In any event, Exhibit A discussed Olofson's misconduct and reprimand while in the Army and was introduced at sentencing because it related to Olofson's personal history and characteristics. The document, which contained hearsay, was not used at trial and was not relevant to the elements of the offense of conviction. Also, Olofson's § 2255 motion does not attack counsel's performance at sentencing, and the document does not establish prejudice respecting the conviction.

Olofson's claims regarding the failure to call potential witnesses fails also. Olofson asserts that an unidentified witness who was brought to trial could testify that the "weapon in question was in his possession just prior to being loaned to the government's witness, and had not shown the characteristics the government was claiming, nor had the Mr.

Olofson [sic] said anything similar to what the governments [sic] witness was claiming in the witnesses [sic] many years of association with Mr. Olofson." (Doc. 4, Attachment A.) However, the Seventh Circuit has held that, to show prejudice from failure to call a favorable witness, a defendant "must make a comprehensive showing of what the potential witness' testimony would have been and how it would have produced a different result." *Brown v. McGinnis*, 922 F.2d 425, 428 (7th Cir.1991); *see also United State v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."). Additionally, the court's review requires consideration of the totality of the evidence presented at trial, and an attorney's errors are more likely to be prejudicial when a verdict is based on weak evidence than when there is overwhelming support for the verdict in the record. *See Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006).

At trial, the government was required to establish beyond a reasonable doubt that Olofson knowingly transferred his machinegun and that he knew, or was aware of, the essential characteristics of the firearm that made it a machine gun. *See United States v. McGiffen*, 267 F.3d 581 (7th Cir. 2001). To this end, the jury heard Kiernicki testify that he contacted Olofson after seeing "an ad on the bulletin down in Subway at the gas station in Berlin, and it said, for sale, AR-15 Colt." (Case No. 06-CR-320, Doc. 76 at 34.) Olofson informed Kiernicki that he could order a kit and assemble an AR-15 for Kiernicki. (*Id.*) In the meantime, Olofson loaned his AR-15 firearm to Kiernicki on four separate occasions and each time Kiernicki had it approximately two weeks. (*Id*. at 35-37, 43.) On the fourth

-5-

occasion, July 13, 2006, Olofson loaned Kiernicki the AR-15 firearm with 500 rounds. (*Id.* at 37.) Olofson never charged Kiernicki for the AR-15, and told Kiernicki he was loaning it to him so that Kiernicki could keep up his training and the skill of shooting. (*Id.* at 38.)

While on the stand, Kiernicki also testified that Olofson told him that the AR-15 had fired automatically in a three-round burst position when he pulled the trigger once and that the gun had jammed on him. (*Id.* at 38-39.) Kiernicki testified that he placed the firearm in the unmarked position and it shot three or four rounds while he was at a shooting range, the Conservation Club, on July 13, 2006. (*Id.* at 39-47.) That was the same day that Olofson gave Kiernicki 500 rounds of ammunition. (*Id.* at 39.) Kiernicki fired in the unmarked third position more than once. (*Id.*) Officers, responding to complaints of automatic fire at the Conservation Club, wrote down the serial numbers of the firearms being used. (*Id.* at 40.) Kiernicki further testified that when he told Olofson about his contact with the local police at the Conservation Club, Olofson responded that he'd "never had trouble with the police while shooting an automatic gun at the Conservation Club in Berlin." (*Id.* at 41.)

Another government witness called to the stand was Paul Harding, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, who routinely investigates alleged violations of the firearms law and worked as a computer forensics examiner. (Id. at 69.) Harding testified that he was involved in the execution of the search warrant on July 19, 2006, and the analysis of some computer hard drives recovered from Olofson's residence. (*Id.* at 70.) Exhibit 9 was a PDF document entitled "AR-15 to M-16 Conversion Book," and the notice on the first page said "this book contains information that gives explicit details on the construction and/or conversion of fully automatic firearms." (*Id.* at

75.) Harding was able to determine that Exhibit 9 had a last access date on Olofson's computer of July 16, 2006. (*Id.* at 83.) Exhibit 10, also found on Olofson's hard drive, was a document describing how to convert a semi-automatic SKS rifle into a SKS rifle that will fire in a full automatic configuration. (*Id.* at 76-77). Additionally, Exhibit 11 was a 2003 e-mail exchange in which an individual asked Olofson about untaxed registering of a machine gun. (*Id.* at 77-78.) Olofson had responded to this e-mail as follows:

> MG's are just the small toys one can get. Remember as a Sovereign you are unhindered by the regulations that the federal citizens must follow. There is a separate set of paperwork dealers must fill out to cover there [sic] butts on where the weapons and other items went. That is what a Sovereigns alien ID number dose [sic] for him. It's just a way of accounting for where it went. Yes you can build any weapon you like. To learn more, especially details on the paperwork you should learn more about Sovereignty first. After some basic knowledge we will walk you through everything the first time to help you get the hang of it. Finding real freedom for the first time is like a babies first steps. You haven't really done it before so you don't know what it's like. But we can change that. Then you can literally do most anything you want so long as it interferes with no others rights or person. Near WI by chance.

(*Id.* at 78, Ex. 11.)

The government's final witness, Firearms Enforcement Officer Max Kingery of the ATF, testified that he examined Olofson's firearm on three occasions. (*Id.* at 101.) He discovered that the firearm had been assembled with four machinegun components: the trigger, the hammer, the disconnector, and the selector switch. (*Id.* at 102.) This would make the weapon fire automatically and would therefore constitute a machinegun. (*Id.* at 102-104.) On cross-examination, Kingery acknowledged that SGW/Olympic Arms manufactured its rifles with some M-16 machinegun parts but never with the combination of parts present in Olofson's firearm. (*Id.* at 118.) Also, when Kingery tested Olofson's firearm with civilian grade ammunition, he fired a total of 60 rounds with three magazines.

(*Id*. at 108.) The first time he held the trigger down and emptied all twenty rounds. (*Id*. at 109.) The next two magazines fired in five to ten round bursts and the weapon fired automatically each time. (*Id*. at 109.) Exhibit 2, which was shown to the jury, was the DVD of Kingery shooting Olofson's firearm on the automatic setting. (*Id*. at 110.) Accordingly, the evidence proffered by the government established that Olofson's AR-15 consistently fired automatically from the time Olofson loaned it to Kiernicki through the ATF final testfire. Indeed, Kiernicki testified that it fired automatically on the day it was seized.

After reviewing the affidavits (Doc. 4, Attachments O, Q, R, and S) and letters from potential witnesses identified by Olofson (Candice Olofson, Michael Robert Berg, Kelly Harris, Martin John Horkan, Patricia Olofson, David Olofson, and Bonnie Geerup-Herbst), the court finds it remarkable that none of these witnesses offer information with respect to Olofson's dealings or conversation with Kiernicki or personal knowledge about the condition of the AR-15 at or about the time Olofson loaned it to Kiernicki. For example, David L. Olofson, defendant's father, avers that he fired the rifle and "at no time did it fire multiple rounds or malfunction." (Doc. 4, Attachment O.) Similarly, Michael Robert Berg, Kelly Harris, and Martin John Horkan claim to have personally fired the AR-15 and never saw it fire automatically. That these individuals never moved the selector switch to the unmarked third position or witnessed Olofson move the selector switch does not mean that it wasn't possible.

More important, none of the these individuals claim to have seen the AR-15 any time after the fall of 2005. Therefore, the testimony of these potential witnesses would not rebut that of the government witnesses who personally observed the firearm in the automatic position on or after July 13, 2006, or had a discussion with Olofson about its

-8-

potential for automatic fire or his (Olofson's) ability to convert an AR-15 to automatic function. Moreover, Olofson failed to demonstrate that the other individuals identified in Exhibits J and K could have undermined the testimony of the government witnesses regarding Olofson's firearm at the time it was confiscated. Consequently, Olofson cannot satisfy the prejudice prong of *Strickland*.

Olofson next asserts that counsel failed to object to the admission of certain irrelevant evidence, and advised him not to testify. Presumably Olofson is referring to the admission of government Exhibits 9 -12, which included the manual discussing the conversion of an AR-15 to an M-16 and several e-mail exchanges.

Counsel objected to the admission of Exhibits 10-12 on relevancy grounds, and the court overruled his objection. (Case No. 06-CR-320, Doc. 76 at 71-74.) In any event, there is no question that these exhibits were relevant because the government had to prove that Olofson knew the firearm he loaned to Kiernicki was a machinegun. Moreover, in the search of Olofson's home, agents found an electronic manual entitled "AR-15 to M-16 Conversion Book," and Olofson told Special Agent Jody Keeku that he knew how to convert a nonautomatic rifle into a machinegun but that Kiernicki would not have the knowledge to make that sort of conversion. (*Id.* at 61-65.)

Olofson further contends that counsel, in negligent fashion, advised him not to take the stand. In examining this claim the court notes that defendant's right to testify is personal to him and may not be waived by counsel on his behalf. *See, e.g., Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987); *Ward v. Sternes*, 334 F.3d 696, 705 (7th Cir. 2003). Here, contrary to this claim, the trial record establishes that Olofson decided not to testify:

| | |
|---|---|
| THE COURT: | I'd like to inquire of the defense regarding the defendant's right to testify. Has there been discussion between the defendant and his counsel concerning the defendant's right to testify? |
| MR. FAHL: | Yes, Your Honor. |
| THE COURT: | Would you like to voir dire your client with respect to that right? |
| MR. FAHL: | No, Your Honor. I mean we've conferred previously. |
| THE COURT: | Mr. Olofson, do you understand that as a defendant in this case you have a right to testify? |
| THE DEFENDANT: | Yes, I Do. |
| THE COURT: | And do you understand the decision whether or not to testify is yours and yours alone? |
| THE DEFENDANT: | Yes, Your Honor. |
| THE COURT: | Do you wish to avail yourself of the opportunity to testify in this case? |
| THE DEFENDANT: | Yes, I do. |
| THE COURT: | So you do want to testify. |
| THE DEFENDANT: | No, Your Honor. I want to – I believe you said avail? As far as my understanding the word is excuse myself from it? |
| THE COURT: | You want to avail yourself of the right not to testify then. |
| THE DEFENDANT: | Yes, sir, I do not want to testify. |

(*Id.* at 181.) Olofson has come forward with no evidence that he was coerced or unduly influenced. Based on the court's colloquy, Olofson could have testified inasmuch as he was aware that it was his constitutional right to do so.

As for Olofson's contention that counsel failed to properly utilize his expert witness, the court concludes that the claim must be dismissed. Olofson asserts that counsel was ineffective by failing (1) to make arrangements for the expert to perform a detailed

-10-

inspection and test the weapons, (2) to demand and pursue all exculpatory evidence, (3) to vigorously object to the removal of the expert from the courtroom during the government's case, and (4) to question the expert effectively regarding testing procedures. (Doc. 4, Attachment C.) According to Olofson, "[s]uch a line of questioning would have brought additional physical evidence in the form of paperwork and videos documenting employees of the BATFE admitting to, and encouraging perjury, and demonstrating ignorance of scientific testing procedures." (*Id.*) Olofson again relies on Attachments E through X to his Amended Motion (Doc. 4).

Olofson's expert, Len Savage, testified that he inspected the firearm at issue and that – based on his examination and from what he saw in the video – he wouldn't want to attempt to test fire the weapon. (Case No. 06-CR-320, Doc. 76 at 150.) He told the jury that he "wouldn't want to" test fire Olofson's Olympic Arms AR-15, Exhibit 1. (*Id.* at 176.) On cross-examination, Savage responded as follows:

> Q: Do you know right now if you took that gun and were able to test fire it, and if you pulled the trigger once, would it fire more than one round?
>
> A: I wouldn't do that after seeing that video.
>
> Q: Okay, but can you tell the jury whether or not you know if that firearm would fire more than one round with one pull of the trigger right now?
>
> A: I'm telling you specifically that gun is malfunctioning and is broken.
>
> . . . .
>
> A: After viewing the video and viewing Agent Kingery's first report and his second report – and since they contradict each other he's got a 50 percent error rate going – I would not fire that firearm until I took it apart and repaired it.

-11-

(*Id.* at 178-179.) Hence, Savage's testimony is inconsistent with the assertion that counsel was ineffective in failing to arrange for a detailed inspection and test fire of the weapon.

To the extent that Olofson claims that counsel did not demand all possible exculpatory evidence from the government, the record reveals that counsel made such a request (Case No. 06-CR-320, Docs. 62, 65, and 65-3) and that Olofson does not identify any exculpatory evidence that was not disclosed. Olofson's expert testified regarding his concerns based on the firearm malfunctioning during the testing. (*Id.* at 166-178). Moreover, Doc. 4, Attachments E through X cited in support of this claim contain hearsay that would have barred their admission.

Olofson's final two arguments are predicated on counsel's alleged failure to "vigorously" object to the exclusion of his expert from the courtroom or otherwise advocate for a jury instruction defining the term "automatically." However, based on this court's familiarity with counsel's performance at trial and the underlying record, the court finds that counsel's performance was not ineffective in either respect. Counsel vigorously objected to the expert's exclusion from the courtroom during the government's case as documented at pages 157-160 of the trial transcript (Case No. 06-CR-320, Doc. 76). Moreover, the Seventh Circuit upheld this court's exercise of discretion in overruling counsel's objection. *Olofson*, 563 F.3d at 661. Additionally, pages 219 to 225 of the trial transcript undermine Olofson's assertion that counsel failed to advocate for a favorable jury instruction. (Case No. 06-CR-320, Doc. 77.) Olofson's attorney vigorously advocated for an instruction regarding the definition of the term "automatically," but this court found and the Seventh Circuit agreed that the proposed instruction was not a correct statement of the law. The language proposed by Olofson was dicta in a footnote of *Staples v. United States*, 511

-12-

U.S. 600, 602, n. 1. As the Seventh Circuit held, the word "'automatically' comports with its ordinary modern meaning ... that is readily accessible to laypersons and is in no sense confusing." *Olofson*, 563 F.3d at 659.

Based on this court's review of the record, it will decline to issue a certificate of appealability. A petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Furthermore, a petitioner must also show that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, reasonable jurists would not debate Olofson's claim of ineffectiveness. Now, therefore,

IT IS ORDERED that Olofson's § 2255 motion is denied.

IT IS FURTHER ORDERED that Olofson's motion for leave to proceed in forma pauperis is denied as moot. Olofson was not required to pay a filing fee and there are no other pending expenses.

IT IS FURTHER ORDERED that the court declines to issue a certificate of appealability.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 9th day of August, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE